CARE, J.
This case brings under review the decision in Jackson v. Heiskell, as to the extent of the lien given to a capias ad satisfaciendum executed, by the 10th section of the revised statute of executions of 1819. The court decided in that case, that the provision contained in that new section of the statute, was not restricted merely to settling priorities between ca. sa. creditors, but was general in its operation : in so much, that if A. levy a ca. sa. on B. and while he is in execution under it, C. gets a judgment against him, and extends his land, and then B. is discharged as an insolvent debtor; the lien of A.’s ca. sa. overreaches C. ’s elegit, and takes the land. But that case being decided by a court of three judges, and the question Deing new and important, we declared that we should be willing to hear it reargued before a full court, if any subsequent case should bring it up. In the case now before us, the point was not re-argued; but we were referred to the former argument, now in print; and to a more abundant source of light we could not have been referred, for it is an argument which exhausts the subject. I have again read it, both in the printed form, and in my notes, and have re-examined my former opinion, with my best care, and with the advantage of conferring with my brethren, and hearing their opinions: still I have found nothing to change, in the view before taken. The law, however harsh, however unwise, is, to my understanding, expressed in terms too plain to be changed by ’^construction, or judicial action in any form. I must, therefore, adhere to my former opinion on the question, to which I refer.
GREEN, J.
This case presents precisely the same question, in respect to the lien of an executed ca. sa. upon the lands of the debtor, which was lately decided in a court of three judges; and it is peculiarly fit for a reconsideration in a full court. But, upon reconsideration, my opinion remains unchanged, and I have but little to add to the observations I formerly made on the question.
The main object of the new section, introduced into our statute of executions at the late revisal, was, obviously, to secure the property of the debtor for the satisfaction of the creditor at whose suit he was in execution ; a preference certainly not unjust in respect to subsequent judgment creditors, who, if no ca. sa., had been executed, would have been postponed. And the only question is, Whether the provision was intended to give this preference to the ca. sa. creditors, only as against the alienations of the debtor, or as to all others who had not acquired a right of some sort in the debtor’s property, anterior to the execution of the ca. sa.? The declaration at the end of the section, as to the binding force of a ca. sa. executed, is in its terms unlimited, and would have effected the object in both its ^branches, without any thing more; overreaching not only all alienations of the debtor, made after the service of the ca. sa. and all judgments against him subsequent to the same period, and giving priority to the creditors at whose suit he was in execution, according to the dates of the service of their respective executions. It is, therefore, difficult, and, indeed, impossible, to ascertain for what purpose the previous provision of that section was introduced : for if the effect of the ca. sa. was frustrated by any means (the death or escape of the debtor) that provision would not in any degree strengthen the rights of the creditors, since they would have been remitted to the original lien of their judgments, precisely as *if the writs of ca. sa. had never been executed. If, on the other hand, the ca. sa. was consummated by the debtor’s taking the oath of an insolvent, the last provision of the section would effect every thing embraced in the former, and more ; as it would determine the priorities among the creditors, which the former part of the section would not. If we say, that it was the whole purpose of the last clause of the section, to determine those priorities, then, in effect, we frustrate intirely the designeof the whole section; and the debtor will be enabled to.give a preference to his creditors, other than those at whose suit he is in execution, to the whole extent of this property, not indeed by direct conveyances, but by confessing judgments to them, and thus enabling them to take his whole property in execution, to the exclusion of those creditors at whose suit he is in custody; and this, in opposition both to the letter and spirit of the statute. How it happened, that this new section of the statute of executions, terminated with a provision which rendered all that preceded it nugatory, we cannot know. I conjecture, however, that it was introduced as an amendment in the senate, with a view to extend the operation of the clause, according to the literal import of the terms of the amendment, without adverting to its effect upon the previous provisions.
COALTER, J.
In construing a remedial statute, the rule is to see how the law stood before, then what was the mischief, and, finally, what remedy has been enacted.
At common law, the execution of a ca. sa. was a satisfaction of the debt, unless indeed the debtor escaped, in which case, it seems, even before the statute 8 and 9 Will. 3, ch. 26, a scire facias lay to have execution against him. 2 Bac. Abr. Escape, C. p. 515, and the cases there cited. It was intirely reasonable, that this act of the debtor should not deprive the plaintiff of his remedy. But if he died in jail, the remedy was at an end, until it was provided, by stat. 21, Jac. 1, ch. 24, that, in that case, a new execution *might go- *334 against the lands, goods and chattels, in the same way as if he had never been taken in execution, provided that such execution against the lands shall not extend to charge any lands, which shall, at any time after the judgment, be sold bona fide for the payment of any of his creditors, and the money paid or secured to be paid to any of his creditors, with their privity and consent. A similar provision was made here, by act of 1748, ch. 12, (j 3, 4, S Hen. stat. at large, 531, with this difference, that in the proviso, the subsequent sale and conveyance which are to be protected, are to be made bona fide for the payment of any of his creditors at whose suit he shall be in execution,- and the money paid or secured to be paid to any such creditors, with their privity. This was re-enacted, by act of 1792, (edi. of 1794, ch. 5, ? 7, 8,) and forms the 8th and 9th sections of the revised statute of executions of 1819. We have no provision similar to that of 8 and 9 Will 3. But, I presume, the common law rule, existing before that statute, would be fortified here, by the policy which runs through all our acts, viz. to continue to give executions until complete satisfaction is made. Rven when a party, so far from escaping, surrenders all his estate, execution may after-wards be obtained, in case he shall again acquire property. So, too, when he dies in prison. Besides, the sheriff here, is not liable except for a voluntary or negligent escape. It would be out of the question, then, to suppose, that a tortious escape should prejudice the creditor, or that a voluntary one should deprive him of all remedy except against the sheriff, who may be insolvent. I take it, then, that either where the debtor escapes, or dies in jail, the plaintiff may have any new execution which he could have had if the ca. sa. had never been executed. If the debtor, before he escapes, has sold his lands, to pay his creditor at whose suit he is in execution, which the creditor has assented to and received the money; of course, such purchase would be protected, even without a provision by law similar to that *'provided in the case of his dying in jail. It would be, in either case, a sale, in fact, by the creditor.
Thus stood the law, as it appears to me, when the legislature took up the subject in the year 1819. The mischief which existed, and was intended to be provided against, was this: the debtor might sell his lands for their value; and might prefer to remain in the prison bounds or in jail, until he had spent the money, and then obtain a discharge as an insolvent debtor. In this case, if he lived to be so discharged,f and did not escape from jail, the creditor would be deprived of his' original lien by the judgment on his lands. The object of the 10th section, was to prevent this. By that section, every sale, conveyance and transfer of any lands or tenements made by any person charged in execution, &c. shall be null and void, as to the creditor or creditors at whose suit he is charged in execution, unless it be absolute and bona fide, and made for the payment of the debt or damages due to such creditor or creditors, and the proceeds be paid, or secured to be paid, within a reasonable time, to such creditor or creditors. In this clause, the words, with their privity, used in the preceding section, are dropped. It may be, that the legislature intended, that a debtor, intending to take the oath of insolvency, might be able to make a better sale, especially on a reasonable credit, than could be made by the sheriff; and if he did this, bona fide, and secured the proceeds to the creditors, so as to pay more of his debts, than by a sale made by the sheriff for cash, subject too, to his commissions, he might do so, without consent of the creditors. But, unless done in this way, the sale, it is said, is void, and the title to the property would pass to and vest in the sheriff, whether it was put into the schedule or not, in the same way, as though no sale had been made. But, if the debtor had sold before he was charged in execution though after the judgment, suing out a ca. sa. being (except so far as this statute provides) an abandonment forever of the creditor’s right to charge the land, in case the debtor should not die or escape (as before ^mentioned) but should take the oath of insolvency, such intermediate sale (it is said, and I have no doubt) would stand good.
But there is also another case, in which, it is said, the creditor cannot, under this clause, affect his debtor’s lands, though not aliened by him: the case of a subsequent judgment ■ creditor taking an elegit, and having the lands extended subsequent to the execution of the ca. sa. It is contended, that, in such case, the ca. sa. creditor, or the sheriff for him, can only take the other moiet37, and the moiety extended subject to the extent. There is no doubt, I believe, that this would be the case, if the extent was before ca. sa. levied. Thus, if A. recovers a judgment against B. and afterwards C. recovers a judgment against him, and has his lands extended; and then A. sues his ca. sa. which is executed, and B. swears out; the schedule will only convey to the sheriff the moiety that is unex-tended, and the other moiety subject to the extent. But if B. dies in jail, or escapes, then A. can resort to his elegit, and will have half the land extended; and if, in doing this, he necessarily interferes with C. he will only be displaced until A. receives his debt, and will then hold until his is paid also. This, it seems to me, would be the inevitable consequence, because the last clause of the section, which declares that all executions of ca. sa. shall bind the real estate of the defendant from the time they shall be levied, could not have the effect to alter the course. This, I believe, is not contended for by any one. But, if A. had levied his execution of ca. sa. before C. had obtained his judgment, and extended the lands; then, if B. the debtor, had either escaped or died in prison, A. could resort to his elegit as aforesaid, and, in that way, no doubt he could affect C. ; but, it is said, if B. is discharged as an insolvent, the schedule will convey to the sheriff the whole land clear of C’s tenancy by elegit, and the sheriff must sell the whole as though no such extent had taken place.
This, I presume, no one will contend could *335 be done under the first member of the section. That is intended, according *to its words, merely to avoid con-vej'ances by the debtor, so as to obviate the mischief above noticed. It says not a word about avoiding liens created altogether by law. If that had been the object, is it to be supposed, that, when the debtor died in jail, or escaped, they would only give the prior judgment creditor an elegit, which at most could only displace the subsequent judgment creditor for a time, and frequently not at all, the other moiety being still there, and subject to be extended, but that when the debtor swore out, the ca. sa. creditor would be permitted to sell the whole, and forever disappoint the other creditor? His want of power to do this, it seems to me, never could have been considered by the legislature as an evil; and, therefore, there is no provision in the first member of the section in relation to such a case. Does the last member of the section necessarily produce this effect?
This, as it seems to me, would be to construe the first member as something in the nature of a preamble, and the second as the enacting clause, extending beyond the principal mischief recited in the preamble. Had the legislature intended by that clause, that liens created by law, as well as sales &c. made by the party, should be avoided, I think it would not only have used more appropriate and explicit words, but would have made some provision for the subsequent judgment creditor, who is thus put in a situation so much worse than he would have stood, had the prior creditor taken his elegit in the first instance. There would have been some provision to give him the residue of the purchase money; so as to place him at least in as good a situation as though he also had sued a ca. sa. To give the law the construction contended for, seems to me not only to hold out a premium to creditors to imprison their debtors, but to impose a penalty on those who will not do so. This is precisely the reverse of the common law. Its original rigour against a creditor suing out a ca. sa. has been relaxed in the cases above noticed, and still further by the provisions in the first member of the section: but, surely, there was no *mischief which required the legislature to go farther: and if the latter member of the sentence can receive a construction, which will satisfy its terms, without producing such consequences, I think we ought to give it.
It seems to me, that it is a mistake to suppose, that this member of the section was intended to create a lien in favour of the creditor, on the land. Every man who took a debtor in execution, had, ipso facto, and before this act, so far a lien on his land, as well as personal estate, that if he conveyed them in any way, fraudulently, or otherwise contrary to law, so as unlaw-r fully to defeat the creditor, the property, though not in the schedule, passed to the sheriff for the benefit of the creditor. Fraudulent conveyances, for instance, being void as to the creditor, the title accrued to the sheriff. So here, when the statute avoids conveyances by the first member of the section, it was unnecessary to go farther, in order to vest the title in the sheriff for the benefit to the creditor or creditors. So it was as to personal property sold, however bona fide, after a fi. fa. delivered to the sheriff. It is the declaration of the law, that the sale is void, which gives the right to the creditor. Whether the last member of the section, then, was intended merely to declare the time, after which sales made by debtors in execution should be void, so as to remove any doubt which might exist on that subject under the first member, or to establish a priority, unknown before, between creditors, where their debtor swore out, I do not think it material, nor is it proper, perhaps, to decide at this time, inasmuch as if it w;as intended either for the one or the other, or both, I think the clause in question merely related to that kind of lien or disability, which was created by the first member of the section.
The question as to the preference between the ca. sa. creditors is not before us. If it was, it might be said, that the debtor whose sale was made under the 9th section, although formerly it would be protected, if made for the benefit of any of his creditors, would not now be protected, if made for the benefit of any of them except in the order *of priority now insisted on ; and also, that although formerly (and under precisely the same words as are now found in the statute) when a debtor swore out, all the creditors shared pro rata, they should now be paid according to priority ; and that even similar words in the clause under consideration, which protects a sale made for the payment of the debt due the creditor or creditors, and paid or secured to be paid to him or them, shall be exercised subordinate to the priorities supposed to be established by the latter clause of this section. That may, however, have been its intention. All I mean to say at present, is, that I do not think it necessary or proper to decide that point.
The section says, that all executions of ca. sa. shall bind the real estate of the defendant from the lime when they shall be levied. It is not even the beginning of a new sentence. If we can, therefore, fairlj' construe it to mean, that they shall bind the land, because no sale can be made, after the world has notice by a ca. sa. levied, that the party is in custody, unless made bona fide to pay the creditor or creditors, it seems to me, every mischief which existed is remedied.
If it be said, that it was unnecessary to enact this clause, in order to fix the time when the disability to convey should begin, because the first part of the section declares, that every sale &c. made by any person charged in execution, means any sale made by him after he is taken in execution ; still I say this may not have been considered intirely clear. Some may have doubted, whether, after execution delivered to the sheriff, though the party had not then been taken, he might not be considered, in some sense, as charged in execution, so as to be unable to convey, should he afterwards be surrendered or surrender himself in execution (something like the case of a fi. fa. delivered to the sheriff) and *336 so the legislature, ex abundante cautela, may have thought proper more explicitly to declare what might have been a fair inference from the preceding words; or it may have been intended also to establish the priorities supposed. . Be this *as it may, however, I am not satisfied, that the legislature intended to create a lien by the ca. sa. so as to overreach rights acquired otherwise than as specified in the preceding member of the sentence. I can see no reason for extending it farther; no mischief to be obviated; but man3r which will be the consequence of such construction, evidently calling for legislative interposition : and being enabled, as it seems to me, to confine the construction as above, I think we ought to do. so.
CABELL, J.
The question decided by E court of three judges in Jackson v. Heis-kell, is now presented for the consideration of a full courr. The counsel who argued that case, are the same who are retained in this, and they have referred us to that argument for their full views of the subject. I was one of the judges who decided that case; and although I acquiesced, after the best consideration I could give to the subject, in the opinions delivered by the other judges, yet it is manifest, from the manner in which I expressed mj' assent, that my mind, even then, was not intirely free from doubt. The publication of Mr. Leigh’s first volume of reports, exhibiting the able argument of the bar, on both sides, much more fully than my own brief and hasty notes had done, has enabled me to estimate their force more correctly; and I have had the benefit of a conference with the other judges who did not sit in that case. The effect of these advantages has been to convince me that I was in error; and I take pleasure in acknowledging it.
It was admitted by the judges who decided Jackson v. Heiskell, that the construction given to the 10th section, as to the lien of a ca. sa. executed, would have, in practice, a harshness of operation, which was probably not foreseen, and, therefore, not intended by the legislature. It was also admitted, that that section could apply only to those cases where debtors should be voluntarily discharged under the insolvent laws. I think the circumstance, that the section was probably intended only to operate on such cases, affords *a clue t'o its true construction. Before the introduction of this provision, there was.no limitation to the debtor’s power of alienation previous to his discharge, except that it should be an honest alienation. He might not only give a preference to one out of many creditors, at whose suit he was in execution, but he, might apply the proceeds of sale to those who had not sued at all. And it was to creditors of the latter description that the preference was most frequently given. Moreover, the power of alienation by the debtors, was frequently perverted to the most fraudulent purposes. It was the object of this 10th section to remedy these evils. That section declares, “that every sale, conveyance and transfer of any lands or tenements, made by any person charged in execution for any debt or damages, shallj be absolutely null and void, as to the creditor or creditors at whose suit he is so-charged in execution, unless such sale, conveyance and transfer be absolute and bona fide, and be made for the payment of the debt or damages- due to such creditor or creditors, and the proceeds of such sale, conveyance and transfer, be paid, or secured to be paid within a reasonable time, to such creditor or creditors.” It is obvious, that if the section had gone no-farther, the debtor, although his power of alienation was much curtailed, might still have aliened for particular ca. sa. creditors, to the exclusion of the others; or, at least, that he might have aliened for the benefit of them all, pari passu. But even these were evils which the legislature determined to prevent. They determined, that whether the lands were sold by the debtor himself previous to his discharge, or by the sheriff after his discharge, the proceeds should be applied to the satisfaction of the creditors, according to the time at which their respective writs of ca. sa. should have been levied. They, therefore, added to that part of the 10th section, already quoted, the clause with which it is ■concluded, viz. “and that all executions of capias ad satisfaciendum, levied after the commencement of this act, shall bind the real estate of the defendant from the time when they shall be levied.” I think the sole ^object of this declaration as to the lien of a ca. sa. levied, is to regulate the order in which the creditors are to be paid out of the proceeds of the sate of an insolvent debtor’s lands, whether the sale be made by the debtor before bis discharge, or by the sheriff afterwards. This inference seems to be irresistible, when we advert to the place and manner in which the declaration is made by the legislature: in the member of a sentence, which speaks of nothing else but of the sale of an insolvent debtor’s property, and of the application of the proceeds. If the legislature had intended it to have a more general operation; if it had intended it to overreach rights acquired by act of law, it would, I think, have made it the subject of a separate and independent section. In construing a remedial statute (such as this evidently is) we are bound to construe it liberally, so as to advance the remedy, and suppress the mischief; but we are not at liberty to construe it so as to go beyond that object, and by doing so, to introduce new mischiefs which will call for new legislation to remove. In construing this section so as to overreach only the voluntarj-alienations of the debtor, and to apply the proceeds of a sale by the debtor or the sheriff to the payment of the different creditors according to the order of the respective levies of their executions, we remove all the evils which the legislature intended to remove. But in giving it a more extensive operation we go beyond the mischiefs which the legislature designed to remove, and we give rise to new ones which it is admitted they did not foresee, and therefore could not intend. .
I am of opinion that the rights acquired by Eoreman, under his elegit, are unaffected by the 10th section of the statute of execu *337 tions; and consequently, that the order of the chancellor dissolving the injunction ought to be reversed.